1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


UNITED STATES OF AMERICA

    vs.                              CASE NO:  2:06mj36-SRW

RICARDO GONZALEZ-OROZCO,

    Defendant.


* * * * * * * * * *

PRELIMINARY EXAMINATION

* * * * * * * * * *

    BEFORE THE HONORABLE SUSAN RUSS WALKER, UNITED STATES MAGISTRATE JUDGE, at Montgomery, Alabama, on Monday, April 17, 2006, commencing at 2:05 p.m.

APPEARANCES:

| | |
|---|---|
| FOR THE GOVERNMENT: | Mr. Todd A. Brown<br>Assistant United States Attorney<br>OFFICE OF THE UNITED STATES ATTORNEY<br>One Court Square, Suite 201<br>Montgomery, Alabama  36104 |
| FOR THE DEFENDANT: | Mr. Kevin L. Butler<br>Ms. Christine A. Freeman<br>FEDERAL DEFENDERS<br>MIDDLE DISTRICT OF ALABAMA<br>201 Monroe Street, Suite 407<br>Montgomery, Alabama  36104 |
| ALSO PRESENT: | Ms. Beverly Childress, Interpreter |

    Proceedings recorded by digital sound recording; transcript produced by stenography and computer.

GOVERNMENT'S EXHIBIT A

RISA L. ENTREKIN, RDR, CRR, Official Court Reporter
U.S. District Court, Middle District of Alabama 334.240.2405

2

1                    EXAMINATION INDEX

2   BRYAN HAMRICK
         DIRECT BY MR. BROWN                    3
3        CROSS BY MR. BUTLER                    7

4   DAVID HENDERSON
         DIRECT BY MR. BROWN                    27
5        CROSS BY MR. BUTLER                    31

6   KEVIN L. COLE
         DIRECT BY MR. BUTLER                   41
7

8                    * * * * * * * * * * *

9        (The following proceedings were heard before the Honorable

10   Susan Russ Walker, United States Magistrate Judge, at

11   Montgomery, Alabama, on Monday, April 17, 2006, commencing

12   at 2:05 p.m.:)

13        THE COURT:  This is United States versus Ricardo

14   Gonzales.  This is 2:06mj36, and we are here for a preliminary

15   examination.  Is everybody ready to proceed?

16        MR. BROWN:  The government's ready, Your Honor.

17        MR. BUTLER:  Defense is ready, Your Honor.  Thank you.

18        THE COURT:  All right.  Call your first witness.

19        MR. BROWN:  The United States calls Bryan Hamrick.

20        THE COURT:  I'm sorry.  Ms. Taylor is looking at me,

21   because I need to swear in the interpreter.

22        (The interpreter is sworn)

23        THE COURT:  All right.  We'll proceed.

24        MR. BUTLER:  Your Honor, at this time, I'm going to

25   invoke the rule.

## Page 3

1  THE COURT: The rule has been invoked. Anybody who is
2  here to testify, let me excuse you, please, unless you are the
3  case agent.
4  (Off-the-record discussion)
5  MR. BROWN: Just go up there. She'll swear you in.
6  THE CLERK: Raise your right hand.
7  BRYAN HAMRICK, the witness, having been duly sworn,
8  testified, as follows:
9  DIRECT EXAMINATION
10 BY MR. BROWN:
11 Q. State your name, please.
12 A. Bryan Hamrick.
13 Q. How are you employed?
14 A. Through DPS, Department of Public Safety, as a state
15 trooper.
16 Q. Were you employed in that capacity back on April the 10th of
17 2006?
18 A. Yes, sir, I was.
19 Q. On that date, did you have an occasion to conduct a traffic
20 stop on an individual later identified as Ricardo
21 Gonzales-Orozco?
22 A. Yes, sir, I did.
23 Q. Would you tell Judge Walker how that came about.
24 A. I was sitting in the median at a turnaround right at the
25 Montgomery-Lowndes County line. If you're familiar with that,

## Page 4

1  there's a big tree. We were kind of sitting under the tree.
2  The defendant's car came by following another vehicle too
3  close. We exited the median to initiate the traffic stop, at
4  which point he had changed lanes and got behind a second vehicle
5  too close. So I initiated the traffic stop at that point. We
6  were probably about the 161 mile marker.
7  Q. Which road was that?
8  A. I-65. I'm sorry.
9  Q. Would that be northbound?
10 A. Northbound.
11 Q. All right. After you pulled over the vehicle, what, if
12 anything, happened?
13 A. I approached the vehicle, asked the driver for his license
14 and registration --
15 MR. BUTLER: Your Honor --
16 A. -- at which point he handed me --
17 MR. BUTLER: Your Honor, I'm sorry to interrupt.
18 If possible, is it possible to pull the microphone
19 toward you?
20 THE WITNESS: I can scoot up just a little bit. I'm
21 kind of short and this chair is kind of big.
22 THE COURT: And everybody slow down a little bit for
23 the interpreter, too.
24 THE WITNESS: Okay. What was the question? I done
25 forgot.

## Page 5

1  Q. (Mr. Brown, continuing:) After the traffic stop, what
2  happened?
3  A. I approached the driver, asked him for his license and
4  registration. He had handed me a bill of sale for the vehicle
5  and a California ID card. No driver's license.
6  Q. Did you approach from the passenger or driver's side?
7  A. I approached on the passenger side of the car.
8  Q. Did he provide you the documents?
9  A. He -- he provided me the bill of sale for the vehicle and
10 the California ID.
11 Q. What did you do after that?
12 A. I had the defendant -- or the driver step out of the
13 vehicle, come to the rear so that I could understand him
14 better. He came out. He was speaking English pretty fine. He
15 could understand what I was saying to him. I told the defendant
16 to hang tight. I was going to run his license and make sure
17 everything was current and good to go.
18 Q. After --
19 THE COURT: I'm sorry. Did you say he gave you a
20 license or did not give you a license?
21 THE WITNESS: I'm sorry. His ID card. I was going to
22 run his ID card.
23 Q. And did you do that?
24 A. I did.
25 Q. What were the results?

## Page 6

1  A. When I ran the subject through BLOC, they advised me that
2  the defendant did not have a driver's license and that he had
3  some immigration issues and asked me if I would hang on to the
4  subject while they contacted ICE to figure out what was coming
5  back in their computer, as far as the immigration problems. I
6  told them I would.
7  Q. Who is BLOC?
8  A. BLOC is -- I can't remember. It's basically the -- it's a
9  DEA task force. They run NCIC, ICE. They run several -- it's a
10 more thorough check than regular NCIC.
11 Q. Okay. Is that the Blue Lightning Operations Center?
12 A. That's it. I couldn't think of it.
13 Q. And they maintain information on a person's immigration
14 status?
15 A. They do.
16 Q. After you were asked to hold the defendant until after they
17 contacted ICE, did you do that?
18 A. I did.
19 Q. What happened after that?
20 A. Basically, I sat there, and I wrote him a citation for no
21 driver's license and a warning for following too close. I was
22 contacted by -- I believe his name is Neal Diamond -- or Diamond
23 is his last name; he's with the ICE agency -- and also Agent
24 Dave Henderson. And we were asked if we could transport him to
25 their office, which is in downtown Montgomery.

Page 7

1  Q. Did you transport him to that office?
2  A. I ride a dog. I'm a canine trooper. I don't have a
3  backseat. So he basically followed us to the office. He -- he
4  was able to drive his car behind my patrol car, and we led him
5  to downtown.
6  Q. He, being --
7  A. The defendant.
8  Q. -- the defendant. At -- did -- aside from the traffic
9  citation, did you -- did you arrest the defendant on any state
10 charges?
11 A. No, sir.
12 Q. Cite him on any other -- with any other summons or anything
13 on state charges?
14 A. No, sir.
15     MR. BROWN: Thank you. Defense is going to have some
16 questions to you.
17     THE WITNESS: Yes, sir.
18     THE COURT: Cross-examination?
19     MR. BUTLER: Thank you.
20         CROSS-EXAMINATION
21 BY MR. BUTLER:
22 Q. Things were moving pretty fast there, so I'm going to have
23 to back up a little bit. You indicate -- you are with the
24 Department of Public Safety.
25 A. Yes, sir.

Page 8

1  Q. You're employed as a trooper?
2  A. Yes, sir.
3  Q. And how long have you been employed as a trooper?
4  A. Since 2002.
5  Q. Well, I might as well get into this now. You indicated that
6  you're a canine trooper?
7  A. Yes, sir.
8  Q. How long have you been working as a canine trooper?
9  A. Since January of '05, so approximately a little over a year.
10 Q. A little over a year.
11 A. Yes, sir.
12 Q. That day, April 10th, 2006 -- again, this is where I'm
13 getting -- you said you were at the Montgomery-Lowndes County
14 line?
15 A. Yes, sir. On I-65.
16 Q. Is there an approximate mile marker indicating about where
17 you were parked in the median?
18 A. It's going to be approximately the 159.
19 Q. And you were -- the stop here on April 10th, 2006, took
20 place at about what time?
21 A. I believe it was around 2:20, 2:25, somewhere in that
22 neighborhood.
23     THE COURT: Is that p.m.?
24     THE WITNESS: Yes, ma'am.
25 Q. So again, this took place about seven days ago at a little

Page 9

1  after noon -- two hours after noon.
2  A. Yes, sir.
3  Q. So the sun was at its highest -- well, the sun was up.
4  A. Yes, sir.
5  Q. There was no rain.
6  A. No, sir.
7  Q. Okay. You indicated that you were on canine duty. Was
8  Trooper Cole with you?
9  A. Yes, sir, he was.
10 Q. Do you and Trooper Cole always work together while you're on
11 canine duty?
12 A. No, sir, we do not.
13 Q. How often do you and Trooper Cole work together?
14 A. This was actually the first time that he had ridden with me
15 in a vehicle.
16 Q. Have -- prior to 2002, did -- have you undergone any
17 advanced -- well, you've had to undergone advanced training to
18 use the dog.
19 A. Prior to 2002?
20 Q. Well, let me rephrase that. Prior to the stop of -- of my
21 client on April 10, 2006, you've undergone advanced training.
22 A. Yes, sir, I have.
23 Q. Has Trooper Cole?
24 A. Not with a canine, no, sir. But he has been through some
25 type of training.

Page 10

1  Q. Okay. Have you gone to the Blue Lightning advanced
2  training?
3  A. No, sir, I have not.
4  Q. Do you know if Trooper Cole --
5  A. I have no idea.
6  Q. Okay. Understand. Why were the two of you riding together
7  that day?
8  A. He is interested in riding a dog for the state, wanted to
9  see how, basically, it went. So I -- he asked me if he could
10 ride with me, and I let him.
11 Q. But it's not normal procedure for the two of you to ride
12 together?
13 A. No, sir.
14 Q. I'm assuming you -- you spotted the vehicle on or about --
15 at 2:20 p.m.
16 A. Yes, sir.
17 Q. Who first saw the vehicle?
18 A. I did.
19 Q. The vehicle was traveling which way, north or south?
20 A. Northbound.
21 Q. Your vehicle was pointed in which direction?
22 A. From that way, it would be pointed east.
23 Q. So let me -- assuming you are north --
24 A. Correct.
25 Q. -- okay, and the vehicle is traveling northbound --

**11**

1  A. Correct.
2  Q. So the record's clear, he is -- well, he's in front of me.
3  Your vehicle was pointed east, so the front of your vehicle was
4  pointed towards the northbound lane?
5  A. Yes, sir.
6  Q. That would make you -- you were the driver?
7  A. Yes, sir.
8  Q. Well, that would have made Mr. -- Officer Hamrick -- excuse
9  me -- Officer Cole the closest person to the northbound traffic.
10 A. Correct. Correct.
11 Q. But he didn't notice the driver. It was you -- you looked
12 through him to see the driver?
13 A. I did not have to look through Cole. No, sir. I looked
14 straight ahead.
15 Q. Okay. So as the car passed -- you didn't notice the car
16 until it was right in front of you.
17 A. Correct.
18 Q. You looked into the side -- you could look into the side
19 window.
20 A. I suppose.
21 Q. Okay. Again, you observed what you believed to be the
22 vehicle traveling too closely, but you could also see the driver
23 inside the car.
24 A. Yes, sir. I don't recall seeing the driver. I just seen
25 the vehicle, is what I looked at.

**12**

1  Q. But there was nothing obstructing your -- well, as the car
2  passed in front of you, there was nothing obstructing your
3  view. You could -- granted -- it's your testimony you were
4  focused on the vehicle, but there was nothing obstructing your
5  view of the car.
6  A. No, sir.
7  Q. And -- okay. And it was a sunny day.
8  A. Correct.
9  Q. What was the vehicle that it was traveling too close to?
10 A. It was a white vehicle. I'm not sure of the make.
11 Q. Was it a van, a sedan, a sports car?
12 A. It was a passenger-car-type vehicle. White.
13 Q. How far was his vehicle from that?
14 A. I would say less than a 50-feet distance between his front
15 bumper and the rear bumper of the vehicle in front of him.
16 Q. What were the traffic conditions, heavy or light?
17 A. I wouldn't call them heavy or light. Just moderate. Same
18 as usual.
19 Q. After you saw the vehicle traveling within 50 feet, you
20 then -- did you activate your lights immediately?
21 A. No, sir.
22 Q. So you pulled into -- watching, of course, for safety, you
23 pulled into traffic traveling north and proceeded to accelerate
24 up to speed to observe the vehicle.
25 A. Yes, sir.

**13**

1  Q. The vehicle wasn't speeding.
2  A. No, sir.
3  Q. It was just traveling too close.
4  A. Yes, sir. To the vehicle in front of it.
5  Q. And you didn't observe it cross lanes or anything either.
6  A. I didn't observe him cross lanes. But from the point where
7  I had seen him, he was in what would I -- what I would call the
8  hammer lane or the inside lane. By the time I had caught up to
9  the vehicle, he was in the passenger lane.
10 Q. I'm a little --
11 A. I'm sorry. Not the passenger lane. The passenger side.
12 The outside lane. The slow lane.
13 Q. That was -- I think you just cleared it up for me. I
14 usually consider the slow lane to be the lane on the right
15 side --
16 A. Yes, sir.
17 Q. -- the passing lane, the one on the left side.
18 A. Correct.
19 Q. You first observed the vehicle -- when you believed it was
20 traveling too close, it was in the passing lane traveling north.
21 A. Correct.
22 Q. At mile marker approximately 159.
23 A. Correct.
24 Q. You got into the traffic and without the lights on,
25 accelerated up to the vehicle. And at that time, you saw him in

**14**

1  the slow lane.
2  A. Correct.
3  Q. Okay. What vehicle was in front of that vehicle at that
4  time?
5  A. Again, it was a separate white vehicle, a sedan. I'm not
6  sure of the make or year.
7  Q. When you say a separate one, when you first observed the
8  vehicle at 159, it was behind a white sedan. When you caught up
9  to it after getting into traffic, it was behind another
10 vehicle. Is it the same white sedan or --
11 A. A separate white sedan.
12 Q. Okay. How far did you have to travel from mile marker 159
13 to the location where you first saw the vehicle again traveling
14 behind a separate white sedan?
15 A. Approximately a mile, mile and a half, give or take a little
16 bit.
17 Q. When you -- when did you act -- all right. So you
18 approached the vehicle. You then relocate his vehicle. It's
19 behind a white sedan. How close did you get before you
20 activated your lights?
21 A. Distancewise, I would say I was probably in the neighborhood
22 of two car lengths behind him.
23 Q. How far was he behind the second white vehicle when you say
24 you saw it driving behind that too close?
25 A. Probably less than 30 feet that time.

15

1  Q. You activated your lights, and the driver complied, correct?
2  A. Yes, sir, he did.
3  Q. He didn't attempt to accelerate or evade you in any way.
4  A. No, sir.
5  Q. Mr. Gonzales pulled the vehicle over. You then approached
6  him on the driver's side.
7  A. On the passenger side.
8  Q. Oh, I'm sorry. For the -- for officer -- for your safety?
9  A. Yes, sir.
10 Q. Because there's -- okay. He was -- you asked for his
11 driver's license?
12 A. Yes, sir.
13 Q. It's your testimony he gave you the wrong -- he didn't give
14 you a driver's license. He gave you some other documentation.
15 A. Correct.
16 Q. Was he still in the vehicle at this time?
17 A. Yes, sir, he was.
18 Q. Did he at that time do anything to pose a danger to you or
19 your other officer?
20 A. No, sir.
21 Q. When he provided you with the wrong document, is that when
22 you asked him to get out of the vehicle?
23 A. Yes, sir.
24 Q. And did he comply?
25 A. Yes, sir, he did.

16

1  Q. Where did he -- and I think your testimony was he went to
2  the back of his vehicle?
3  A. Yes, sir.
4  Q. Okay. Where was Officer Cole -- Cole at this time?
5  A. He was -- I'm not sure exactly where he was standing, but he
6  was outside of our vehicle, somewhere between our vehicle and
7  their vehicle.
8  Q. I see. So you pass on the passenger side. Officer Cole
9  exited but stayed more towards your vehicle while you were
10 conducting the initial questioning of Mr. Gonzales.
11 A. I'm not sure exactly what Cole did.
12 Q. Okay. At some point, though, you recognized that he was out
13 of the vehicle.
14 A. Yes, sir.
15 Q. And that was -- when Mr. Gonzales had exited the vehicle and
16 was going back towards his vehicle, you observed Officer Cole.
17 A. Yes, sir.
18 Q. Was the dog out of the vehicle?
19 A. No, sir.
20 Q. Was the dog ever removed from the vehicle during this stop?
21 A. No, sir.
22 Q. I mean I guess I may be stating the obvious. The purpose of
23 having the dog is drug interdiction?
24 A. Yes, sir.
25 Q. So your training is in -- well, you're a trooper, but you

17

1  also have specialized training in drug interdiction.
2  A. Yes, sir.
3  Q. And you had the dog with you that day in case -- if and in
4  case that was necessary.
5  A. Yes, sir. For myself or any other trooper.
6  Q. Uh-huh. Were there any other troopers working -- well, let
7  me first lay the foundation for this. What section or segment
8  are you -- were you assigned to that day? I hope I'm saying
9  this right. It's my understanding that you, like, have a
10 trooper post or -- and what were you assigned to do that day?
11 A. Montgomery County.
12 Q. Montgomery County --
13 A. Yes, sir.
14 Q. -- which is the entire Montgomery County?
15 A. Yes, sir.
16 Q. You had elected -- I'm assuming you have some discretion --
17 to observe traffic between -- at or near the 159 mile marker.
18 A. Yes, sir.
19 Q. And again, you were with Trooper Cole.
20 A. Yes, sir.
21 Q. Was there any other police officer working that area, the
22 159 area, near the Lowndes-Montgomery border?
23 A. There was another trooper in the area. I don't know if he
24 was actually working that specific area, but there was another
25 trooper in the area.

18

1  Q. Do you recall what that trooper's name was?
2  A. Yes, sir. Corporal Todd Teal.
3  Q. Did Todd Teal at all ever -- did he ever respond to the stop
4  of Mr. Gonzales?
5  A. Yes, sir, he did.
6  Q. How long before you stopped Mr. Gonzales before Trooper Teal
7  showed up?
8  A. Right at the end of the stop. It had been -- the stop was
9  almost completed when Corporal Teal came up.
10 Q. Well, you're kind of answering my next question. From the
11 time that you stopped Mr. Gonzales to the time Mr. Teal showed
12 up, what was the length -- what's that length of time?
13 A. To be honest with you, I have not a clue. I couldn't even
14 give you an estimate. I haven't timed it.
15 Q. Okay. Your car was equipped with a video camera.
16 A. Yes, sir, it was.
17 Q. And thank you and your office for providing us with a copy
18 of that video camera. Do you know if it had sound on it? I
19 haven't had time to look at it yet.
20 A. It does in certain points. Yes, sir.
21 Q. Does. Does the sound activate automatically when you
22 touch or -- do you have to do something to make the sound work?
23 A. No, sir. The sound is activated when I turn my blue lights
24 on.
25 Q. Okay. So from the point that the blue lights are on, all

### 19

1  conversations where you're near the person should be recorded.
2  A. Yes, sir.
3  Q. Okay. Have you had a chance to review the video?
4  A. Most of it. Yes, sir.
5  Q. There is no time code on the video indicating when it starts
6  stop -- when it starts and when it stops?
7  A. I believe there is. I just -- I haven't looked at it. I
8  didn't look at the time when I made the stop.
9  Q. You weren't paying attention to the time code.
10 A. Correct.
11 Q. Okay. You ran Mr. Gonzales through the Blue Lightning -- I
12 think it was Operations Center, BLOC HIDTA.
13 A. Yes, sir.
14 Q. Did you run him through NCIC?
15 A. No, sir.
16 Q. Did you run him through local Montgomery dispatch?
17 A. No, sir.
18 Q. The only, I guess, background check agency you ran him
19 through, then, was BLOC HIDTA.
20 A. Yes, sir.
21 Q. You're aware that BLOC HIDTA is, not primarily, but often
22 used in drug-related and immigration-related cases.
23 A. Yes, sir.
24 Q. But the basis of the stop here was for driving too close.
25 A. Yes, sir.

### 20

1  Q. Did you smell narcotics in Mr. Gonzales's vehicle?
2  A. No, sir.
3  Q. Okay. He did produce to you -- he did not produce a
4  driver's license, correct?
5  A. Correct.
6  Q. He produced a vehicle registration.
7  A. No, sir. He produced a bill of sale.
8  Q. A bill of sale. But he did not provide you with any false
9  immigration-related documents, did he?
10 A. No, sir.
11 Q. Who -- I have the quote, but I couldn't get the name. Who
12 advised you to hang on to the subject?
13 A. The subject's name is Charlie. He is a dispatcher -- I
14 guess it would be called a dispatcher for BLOC. The phone
15 number -- I don't know what you would actually call him. He's
16 the one I talk to when I call BLOC, one of the subjects.
17 Q. That's -- this was my question, also. Do you have to make
18 a -- for lack of a better word, you don't call BLOC HIDTA using
19 the radio in your car.
20 A. Correct.
21 Q. You have to use a separate telephone, sometimes a personal
22 phone, to call BLOC HIDTA.
23 A. You can. I use a state phone.
24 Q. Oh. How did you contact him? You used a cell --
25 A. A used a phone from the State that the State has given to

### 21

1  me.
2  Q. Okay. So you never even ran him through the system within
3  your vehicle. You used a separate phone.
4  A. Correct.
5      MR. BUTLER: I'm going to try to move this along, Your
6  Honor. I know you don't want to drag this out.
7  Q. Mr. Gonzales is standing behind his vehicle at your --
8  pursuant to your instruction. Again, he's not posing a threat
9  to you or Officer Cole that you can observe.
10 A. Correct.
11 Q. Well, maybe I can just expedite. He never did, through the
12 entire stop, pose a threat to you or Officer Cole, based on what
13 you could observe.
14 A. Pose a threat, no, sir.
15 Q. Okay. Or a flight risk, that he's trying to run away.
16 A. At one point, we were getting a little suspicious that he
17 might try to go somewhere.
18 Q. Well, my question is did he ever try.
19 A. He did not. No, sir.
20 Q. Okay. You then -- I guess did Officer Cole kind of keep an
21 eye on Mr. Gonzales while you ran -- made the phone call?
22 A. Yes, sir.
23 Q. Have you been deputized or -- or authorized to work in an
24 immigration capacity here in the state?
25 A. No, sir, I have not.

### 22

1  Q. Do you know if Officer Cole has?
2  A. I don't know.
3  Q. Okay. Charlie, the person on the telephone, said hang on to
4  the subject.
5  A. Yes, sir, he did.
6  Q. From the time that you called Charlie to the time that he
7  said hang on, do you recall how long that was or --
8  A. I don't really recall. Approximately ten minutes, maybe.
9  Q. It took ten minutes for --
10 A. Approximately.
11 Q. During that ten-minute time period, did Mr. Gonzales -- he
12 was just standing in front of the vehicle?
13 A. No, sir. At one point, he was sitting on the ground. One
14 point, he was standing up. One point, he was walking between
15 the vehicles.
16 Q. Okay. But he was outside of his vehicle at all times.
17 A. Yes, sir, he was.
18 Q. After ten minutes, he said hang on to the subject. How long
19 between the hang on to the subject and the time that Officer
20 Diamond or Agent Diamond showed up?
21 A. Agent Diamond never came to the scene.
22 Q. Oh. I got confused. Who came to the scene to take
23 Mr. Gonzales away, for lack of a better word?
24 A. No one did.
25 Q. Well, then I am confused. You indicated that you had a dog

23

1  in the car, so you couldn't transport Mr. Gonzales.
2  A. That's correct.
3  Q. Oh, maybe you answered it. Was it Officer Teal who
4  transported him?
5  A. No, sir. He used his own vehicle. He followed us to the
6  ICE agents --
7  Q. Oh. Oh.
8  A. -- downtown.
9  Q. So Mr. Gonzales got back into his own vehicle?
10 A. Yes, sir.
11 Q. Yet he didn't have a driver's license or -- was he boxed in
12 at all? Was there an officer behind him and one --
13 A. Corporal Teal was behind him, and my vehicle was in front of
14 him.
15 Q. That transport -- well, self-transport -- back to -- where
16 was it?
17 A. The HIDTA office downtown.
18 Q. -- the HIDTA office, how long after the hang on to the
19 subject did that begin?
20 A. Again, I don't really know. I didn't look at the time.
21    (Brief pause)
22    MR. BUTLER: Your Honor, may I have one moment?
23    THE COURT: Yes.
24    (Brief pause)
25 Q. You indicated at mile marker 159 that you saw the vehicle --

24

1  and you're guesstimating -- driving approximately 50 feet from
2  the white sedan, first white sedan, and you indicated that you
3  saw him driving approximately 30 feet from the second white
4  sedan.
5  A. Yes, sir.
6  Q. How far is a vehicle supposed to travel?
7  A. Twenty feet for every 10 mile per hour behind the vehicle in
8  front of it.
9  Q. Twenty feet. So, for instance, if we were both traveling at
10 50 miles an hour, I should have at least a 50-foot gap between
11 me and your -- or a hundred-foot gap --
12 A. Hundred-foot gap. Yes, sir.
13 Q. -- between me and my car.
14 A. Yes, sir.
15 Q. Do you recall during -- I know this is a tough one, and
16 you -- approximately how many tickets for driving too closely
17 you wrote in the year prior to -- year prior to 2006?
18    MR. BROWN: Objection to relevance.
19    THE COURT: Well, I'm not sure it's irrelevant. It may
20 not be probative of anything before me. This is just a probable
21 cause hearing.
22    MR. BUTLER: Because it is slightly relevant -- I'm not
23 going to drag this on anymore. This is --
24    THE COURT: Well, I'll -- I'll overrule the objection
25 and let him answer that question.

25

1  A. I'm not sure.
2  Q. Okay. I can't remember what the expression -- more than
3  ten, less than 20, or you just don't even want to venture a
4  guess?
5  A. I would say more than 20 --
6  Q. Okay.
7  A. -- and less than 50.
8  Q. Okay. And I'm not holding you to that. I know it's --
9  A. Okay. That's a big guess.
10 Q. Okay.
11    THE COURT: Mr. Butler, before you sit down, let me ask
12 something in case you want to follow up on it.
13    You've testified about how the defendant came to be
14 stopped. The complaint before me charges him with illegally
15 reentering the United States without permission, unlawfully
16 possession -- possessing an identification document, and falsely
17 representing a Social Security number as his when it was not.
18 Did you -- do you have any information about whether he did any
19 of those things, or are you just here to tell me about how he
20 was stopped?
21 A. Just about how he was stopped, ma'am.
22    THE COURT: Okay. Thank you.
23    MR. BUTLER: Follow-up question.
24 Q. (Mr. Butler, continuing:) You had -- other than running him
25 through BLOC, did you -- were you involved in any other

26

1  investigation -- and writing the ticket --
2     MR. BUTLER: Well, strike that, Your Honor. I don't
3  need to follow up on that.
4  Q. Was there -- there was a passenger in the vehicle?
5  A. Yes, sir, there was.
6  Q. Male or female?
7  A. Male.
8  Q. Was that person arrested, to your knowledge?
9  A. I have -- not to my knowledge. He was not arrested.
10 Q. During -- I'm not going to go through each minute of this,
11 but did he remain in the vehicle during the whole stop?
12    MR. BROWN: Again, Your Honor, I'm going to object to
13 relevance as to probable cause. I mean we're here for a
14 probable cause hearing.
15    THE COURT: How is it relevant, Mr. Butler?
16    MR. BUTLER: Your Honor, this is just my last question,
17 just wanted to -- well, he was somebody who's a potential
18 witness for us to everything that took place.
19    THE COURT: I'll overrule it. I'll allow him to answer
20 it, and then let's conclude.
21 A. He was pulled out of the vehicle at one point, just for
22 safety reasons, before we were to transport them back. We
23 wanted to make sure there was no weapons in the vehicle or on
24 him.
25 Q. And you don't know where he -- he or -- he drove back with

**27**

1  you to HIDTA -- I mean with -- in the car to HIDTA?
2  A. Correct.
3  Q. Do you have any knowledge of where he is now?
4  A. No, sir, I do not.
5      MR. BUTLER: Thank you.
6      THE COURT: Anything further?
7      MR. BROWN: No redirect, Your Honor.
8      THE COURT: You may step down. Thank you.
9      THE WITNESS: Thank you.
10     THE COURT: Call your next witness.
11     MR. BROWN: The government calls Dave Henderson, Your
12 Honor.
13     DAVID HENDERSON, the witness, having been duly sworn,
14 testified, as follows:
15         DIRECT EXAMINATION
16 BY MR. BROWN:
17 Q. Would you state your name, please.
18 A. David Henderson.
19 Q. How are you employed?
20 A. I'm a special agent with United States Immigration and
21 Customs Enforcement.
22 Q. Were you employed in that capacity on April 10th, 2006?
23 A. Yes, I was.
24     MR. BUTLER: Your Honor, and I'm sorry to shortcut. We
25 may call Officer Hamrick back in, so if he could step out.

**28**

1      THE COURT: Mr. Hamrick, would you --
2      TROOPER HAMRICK: Yes, ma'am.
3      THE COURT: -- leave the courtroom? Thank you.
4      MR. BUTLER: I'm sorry.
5      MR. BROWN: May I continue?
6      THE COURT: Yes.
7  Q. Were you employed as an ICE agent on April 10th, 2006?
8  A. Yes, I was.
9  Q. Are you -- are you the case agent in a case involving a
10 defendant by the name of Ricardo Gonzales-Orozco?
11 A. I am.
12 Q. You were present in the courtroom a moment ago when Trooper
13 Hamrick testified; is that true?
14 A. That's correct.
15 Q. Did you hear Trooper Hamrick describe the fact that after an
16 immigrations check following a traffic stop, that he was
17 instructed to bring the -- the defendant to the HIDTA office?
18 A. Yes. I -- I heard that.
19 Q. Okay. Where is your office?
20 A. It's located at 301 South Ripley. It's the old
21 St. Margaret's Hospital.
22 Q. And your office is within the HIDTA office.
23 A. It is.
24 Q. Did -- did Trooper Hamrick and others eventually transport
25 the defendant to you?

**29**

1  A. They escorted the defendant and the other subject to our
2  office.
3  Q. All right. Did you have opportunity after that to interview
4  Mr. Gonzales?
5  A. Yes, I did.
6  Q. What, if anything, happened in relation to that?
7  A. Mr. Gonzales stated that he was a native and citizen of
8  Mexico. He stated that he had illegally entered the United
9  States, I believe somewhere near -- I want to say somewhere near
10 Tijuana, Mexico, which would be near San Diego, California.
11 Checks with the immigration service revealed that Mr. Gonzales
12 had previously been removed from the country on October 24th,
13 2004, by border patrol agents at the Otay Mesa, California,
14 post.
15 Q. All right. Did you obtain any information as to whether
16 Mr. Gonzales had obtained permission from the proper authorities
17 to be in the United States on this occasion on April 10th?
18 A. According to the immigration service, Mr. Gonzales has not
19 obtained permission to reenter the United States.
20 Q. Subsequent to that, did you then arrest Mr. Gonzales for
21 being in the United States illegally?
22 A. That's correct.
23 Q. And pursuant to a -- did -- did you search Mr. Gonzales
24 afterwards?
25 A. I searched his property after we had arrested him. Yes,

**30**

1  sir, I did.
2  Q. Did -- during the course of that search, did you find any
3  identifying documentation with -- that he had in his possession?
4  A. During the search of Mr. Gonzales's wallet, we found
5  numerous Social Security cards. One of them appeared to be
6  fraudulent, in my opinion, from my training. I asked
7  Mr. Gonzales about that -- or Agent Diamond and I asked
8  Mr. Gonzales about that Social Security card. He stated that it
9  was -- I can't recall the name it was in, but he stated that he
10 did use that Social Security card for work and tax purposes.
11 Q. Okay. Was it properly assigned to -- to the defendant?
12 A. No, it is not.
13 Q. You verified that through some sort of computer check?
14 A. I contacted Social Security Administration, and they advised
15 that that number did relate to the name that was on the card,
16 but it was not Mr. Gonzales's name.
17     THE COURT: I didn't quite follow that.
18     THE WITNESS: Your Honor, if I may take a look at my
19 affidavit. I can't remember the name that the -- the individual
20 that the Social Security card was in the name of.
21     THE COURT: Have you got it?
22 (Brief pause)
23 A. The name on the Social Security card was Luis Barajas, Your
24 Honor. Mr. -- when I contacted the Social Security
25 Administration, they did state that that card or the number on

### Page 31

1  the card did belong to a Luis Barajas, but Mr. Gonzales stated
2  that that was not his name and that he had used that card for
3  employment and tax purposes.
4       MR. BROWN: I believe that's all the questions I have,
5  Your Honor.
6       CROSS-EXAMINATION
7  BY MR. BUTLER:
8  Q. Just clearing up some timeline questions, again, you -- like
9  Mr. Brown pointed out, you were present in court during Officer
10 Hamrick's testimony.
11 A. That's correct.
12 Q. Did Officer Hamrick or Cole contact you about their
13 detention of Mr. Gonzales?
14 A. Originally, when Trooper Hamrick contacted BLOC, BLOC is
15 an -- is run by Department of Homeland Security, U.S.
16 Immigration and Customs Enforcement. When troopers or other law
17 enforcement utilize that and they make -- things come up that we
18 need to know about, we're contacted by BLOC. I believe it was
19 Agent Diamond who was originally contacted by BLOC.
20 Q. Oh, I see. So Agent Diamond -- just kind of going through
21 this, Hamrick contacts BLOC. BLOC says there's a problem; hold
22 him. While that's going on, BLOC contacts Agent Diamond, who
23 then notifies you.
24 A. That's correct.
25 Q. Is Agent Diamond located in the Montgomery office?

### Page 32

1  A. Yes, he is.
2  Q. Okay. You two work together.
3  A. That's correct.
4  Q. Okay. Do you recall about the time that you were first
5  notified?
6  A. I -- specifically, no. I believe it was sometime
7  approximately after three p.m.
8  Q. Okay. Were you and Agent Diamond -- did you both meet --
9       MR. BUTLER: Just a second, Your Honor. Allergies.
10 Q. Did you and Mr. -- Agent Diamond both meet Mr. Gonzales when
11 he arrived at the HIDTA office?
12 A. I instructed -- or I contacted Trooper Hamrick and
13 authorized him to detain Mr. Gonzales and the other individual
14 in the vehicle, instructed them to transport them down to our
15 office. Upon arriving, I met Trooper Hamrick on the street.
16 Q. I see. When he said BLOC came back and said hang on to the
17 subject, is that BLOC or is that you?
18 A. BLOC notified Trooper Hamrick that there was a possible
19 immigration warrant for Mr. Gonzales and to -- and asked him to
20 hold on to Mr. Gonzales while we were contacted. I then
21 instructed -- once I found out, I instructed Trooper Hamrick to
22 detain Mr. Gonzales on my authority.
23 Q. I see. So you -- maybe it's that -- that ten-minute --
24 approximate ten -- approximate ten-minute period where
25 Mr. Gonzales is standing, sitting in front of the vehicle before

### Page 33

1  he's actually transported back, the "go" to transport him back,
2  for lack of a better word, came from you.
3  A. To bring him to the Montgomery HIDTA? That was on my
4  authority.
5  Q. Yes. Okay. When they got back to HIDTA -- when I say
6  "they," Mr. Gonzales and the passenger -- where were they taken
7  to?
8  A. They were brought to our office.
9  Q. They were brought to your office? Were they handcuffed?
10 A. No, they were not.
11 Q. Okay. Could -- Mr. Gonzales couldn't have simply -- and/or
12 the passenger couldn't have said, well, this has been fun and
13 just walked off at that point.
14 A. We had detained them for further investigation.
15 Q. Okay. They weren't free to -- they -- they had been
16 detained. You indicated that they were questioned. Were they
17 questioned in your office, for lack of -- when I say -- where
18 within your office?
19 A. We have an interview room. That is where I and Agent
20 Diamond spoke with Mr. Gonzales.
21 Q. So there were two of you together speaking?
22 A. That's correct.
23 Q. Did you speak in Spanish during that interview?
24 A. Some Spanish, some English.
25 Q. It was clear to you that his native language was Spanish.

### Page 34

1  A. He -- yes. I would say he's predominantly Spanish.
2  Q. But he -- it's your testimony, I'm assuming -- and you can
3  verify -- that he could understand some English.
4  A. That's correct.
5  Q. Was a Miranda form given to him?
6  A. Yes, it was.
7  Q. English or Spanish?
8  A. Spanish.
9  Q. Was that Miranda form given to him before any questioning
10 took place?
11 A. The only questions that were asked prior to the -- being --
12 his Miranda rights being read to him were his name, his date of
13 birth.
14 Q. The passenger, where was he during this time period?
15 A. He was in a -- in an adjacent room.
16 Q. Well, I'll just cut to the quick. Where is the passenger
17 now?
18 A. Agent Diamond determined that the passenger -- I believe his
19 name was Juan Ganez Vega -- was determined to be an illegal
20 alien, a citizen of Mexico. The best of my knowledge, I know
21 Agent Diamond processed him for deportation proceedings. I'm
22 unaware at this time whether Agent Diamond issued him a release
23 upon his own recognizance to answer Immigration at a later date
24 or that he was transported to the Etowah County Jail. At this
25 time, I do not know.

35

1  Q. Was the passenger in possession of any Social Security cards
2  or any other documents?
3  A. I believe the passenger was in possession of a Mexican
4  identification card.
5  Q. And you're not aware whether the passenger had any
6  questionably authentic Social Security or identification --
7  or -- what do you call it? -- green card?
8  A. To the best of my knowledge, he did not.
9  Q. Did you question the passenger?
10 A. No, I did not.
11 Q. Okay. The questioning of Mr. Gonzales took place with both
12 you and Mr. Diamond at all times. I mean the two of you guys
13 were present during all questioning.
14 A. I believe there was a moment when Agent Diamond stepped out
15 of the room or -- we were both in and out running records
16 checks.
17 Q. I see. So the questioning was you, Agent Diamond -- you two
18 were predominantly together, but you both had to come in and out
19 to do business.
20 A. The questioning of Mr. Gonzales was only a -- was only a few
21 questions. And I believe that Agent Diamond and I were together
22 during those questions.
23 Q. Okay. How long was Mr. Gonzales held at HIDTA before he was
24 taken to city jail or some other detention facility?
25 A. I'm unaware of the length of time.

36

1  Q. Did you take him?
2  A. I did.
3  Q. Was it nighttime or daytime? Was the sun still out?
4  A. I believe it was no later than somewhere between five and
5  six p.m.
6  Q. And he was taken to the city jail?
7  A. That is correct.
8      MR. BUTLER: Your Honor, may I have a moment?
9      THE COURT: Yes. While you do that --
10     He's charged with unlawfully possessing an
11 identification document. Was it illegal for him to have the
12 Social Security card for Luis Barajas that you mentioned?
13     THE WITNESS: Yes, Your Honor. In my training, Your
14 Honor, the Social Security card appears to be fraudulent. It
15 has been sent off for forensic analysis at this time. There are
16 just certain -- in my training, certain things that I've been
17 trained in to look for on identification documents, security
18 features, which this document did not possess and, in my
19 opinion, was a fraudulent document.
20     THE COURT: So it would be illegal to possess it
21 because the document was fraudulent, you believe, not because it
22 was in somebody else's name?
23     THE WITNESS: Well, also, Your Honor, Mr. Gonzales
24 stated that he had used that document.
25     THE COURT: So it would be illegal -- I understand it

37

1  would be illegal to falsely represent the Social Security number
2  as his own when it is not. Is it illegal simply to possess that
3  Social Security card on its own?
4      THE WITNESS: A fraudulent one? Yes, Your Honor.
5      THE COURT: Okay. Because you believe it's fraudulent,
6  though, not because it belonged to somebody else.
7      THE WITNESS: That's correct.
8  Q. (Mr. Butler, continuing:) Hopefully I'm not repeating the
9  exact same questions the Judge just asked, but let's say that I
10 possess Ms. Freeman's -- or yours -- Social Security card.
11 That's, in and of itself, not illegal, for me to possess someone
12 else's Social Security card.
13 A. Not that I know of.
14 Q. Okay. It would be illegal for me to possess, whether it's
15 mine, yours, or anyone's, a Social Security card which is
16 determined to be fraudulent.
17 A. That is correct.
18 Q. It is your belief that the Social Security card is
19 fraudulent.
20 A. That is correct.
21 Q. But there has been no final verification of that.
22 A. It's been submitted for forensic analysis.
23 Q. It's been submitted, but they haven't come back and said,
24 yep, it's a bad one, yet.
25 A. Not at this time.

38

1  Q. Where did Mr. Gonzales indicate that he had used the Social
2  Security card?
3  A. There was also a pay stub that was in his wallet with the
4  same name, Luis Barajas, and the same Social Security number. I
5  don't recall the name of the company, but Mr. Gonzales did state
6  that that was a card that he'd utilized for work and tax
7  purposes.
8  Q. Okay. So the statement from Mr. Gonzales, to your
9  recollection, was he had used the card for tax and works
10 purposes, but he never said where exactly he used it. I mean I
11 got a job at McDonald's, and I used it to get the -- by way of
12 hypothetical, I used the card at McDonald's yesterday to get a
13 job. He never made a statement like that. He just said I had
14 used it to get a job and for taxes.
15 A. Like I said, the pay stub, I'm not -- don't recall at this
16 time the company that it was. But Mr. Gonzales had stated that
17 that company was the one that he had used it for.
18 Q. Okay. Last thing. Assume -- well, Mr. Gonzales said he --
19 according to you, he said he used the pay -- the Social Security
20 number at that employer -- at the place with the pay stub.
21 A. That is correct.
22 Q. Therefore, you're assuming that that pay stub was one issued
23 to Mr. Gonzales using this name. He never said that's my pay
24 stub.
25 A. It was found in his possession, his wallet.

### Page 39

1  Q. I agree.
2  A. Did he state that it was his? He stated that the Social
3  Security card was his and that he had used it. And it was in
4  the same name.
5  Q. But my question is, did he state that that pay stub was his?
6  A. The pay stub? No.
7  Q. Final question. Was this interview recorded in any way,
8  videotape or audiotape?
9  A. No, it was not.
10 Q. I'm not asking for them right now, but did you take notes
11 or -- contemporaneously with that interview?
12 A. Yes, I did take notes.
13 Q. Okay. Well, I've got to ask. Did you -- did you use those
14 notes to refresh your recollection prior to testifying today?
15 A. No, I did not.
16     MR. BUTLER: Your Honor, may I approach Ms. Freeman?
17     THE COURT: Yes.
18     (Brief pause)
19 Q. Last few questions. Again, you said you couldn't remember
20 the exact name of the employer that the pay stub matched. Do
21 you remember the town, location? Is it North Alabama, south --
22 is it Atlanta or --
23 A. At this time, I don't recall.
24 Q. You have no recollection regarding the exact name of it or
25 location.

### Page 40

1  A. No, I do not.
2     MR. BUTLER: Thank you.
3     THE COURT: Any redirect?
4     MR. BROWN: No, Your Honor.
5     THE COURT: You may step down. Thank you.
6     THE WITNESS: Thank you, Your Honor.
7     THE COURT: Any other witnesses for the government?
8     MR. BROWN: No, Your Honor. And -- and if I may, I
9  didn't anticipate this going quite this long. Agent Henderson
10 is due to be in Judge Coody's courtroom at three p.m. for a
11 hearing.
12     THE COURT: He's excused unless there's some reason he
13 needs to stay.
14     MR. BUTLER: Your Honor, we don't anticipate recalling
15 him. We know where he is if we do.
16     THE COURT: All right. You're excused.
17     AGENT HENDERSON: Thank you, Your Honor.
18     THE COURT: Thank you. Any other witnesses?
19     MR. BUTLER: Yes, Your Honor. At this time, I call
20 Officer Cole.
21     THE COURT: All right. I have to take a plea and do an
22 initial appearance at three, so let's see if we can wind this up
23 as quickly as we can.
24     MR. BUTLER: Yes, Your Honor.
25     THE CLERK: Officer Cole, come to the courtroom,

### Page 41

1  please.
2     (Brief pause)
3     THE CLERK: If you'd raise your right hand.
4     (The witness is sworn)
5     MR. BUTLER: And I will expedite this.
6     KEVIN L. COLE, the witness, having been duly sworn,
7  testified, as follows:
8                DIRECT EXAMINATION
9  BY MR. BUTLER:
10 Q. Officer Cole, could you state your name and spell your last
11 name for the record.
12 A. Trooper Kevin L. Cole.
13 Q. And how do you -- C-O-L-E?
14 A. Yes, sir.
15 Q. Trooper Cole, how long have you been employed by the Alabama
16 State Troopers?
17 A. April of '01.
18 Q. In your capacity as a trooper, have you ever had any
19 cross-training with Homeland Security; specifically, INS?
20 A. In regards to --
21 Q. Have you had any training -- excuse me?
22 A. In regards to what?
23 Q. Immigration-related.
24 A. No, sir.
25 Q. Okay. Have you been deputized to assist Homeland Security

### Page 42

1  or INS?
2  A. Outside of my normal trooper job, no, sir.
3  Q. Okay. And maybe you've already answered this. You received
4  no specialized training in INS procedures?
5  A. No.
6  Q. Okay. Or Homeland Security procedures?
7  A. No, I have not.
8  Q. Okay. What is your normal area of patrol? Well, let me
9  rephrase that. That's too broad. On or about April -- between
10 the beginning of January and now, where have you been assigned?
11 A. End of January and now?
12 Q. Yes.
13 A. Montgomery post.
14 Q. Okay. Have you ever been assigned to posts other than
15 Montgomery?
16 A. No.
17 Q. Okay. So during the five years you've worked there, you've
18 worked in the Montgomery post.
19 A. Correct.
20 Q. Okay. Do you usually ride along with another officer?
21 A. No.
22 Q. How do you -- do you usually patrol by yourself?
23 A. That's correct.
24 Q. Ninety percent of the time? I'm guessing approximately 90
25 percent of the time you're by yourself, maybe more?

### 43

1  A. I'm always by myself.
2  Q. Why were you with Trooper Hamrick on the 10th?
3  A. I've been trying to get into civilian canine for law
4  enforcement.
5  Q. Okay. You stopped a vehicle on that day, the vehicle driven
6  by Mr. Gonzales.
7  A. I did not. No.
8  Q. Okay. A -- you were in the -- Trooper Hamrick's car when
9  Mr. Gonzales's vehicle was stopped.
10  A. That's correct.
11  Q. Is it your position that you had no role in the stop at all?
12  A. In -- I was with the trooper as he conducted the traffic
13  stop.
14  Q. Maybe I should ask this. Were you on duty?
15  A. Yes.
16  Q. Who first noticed the vehicle?
17  A. Trooper Hamrick.
18  Q. And did he shout out to you what he observed the vehicle --
19  the infraction being? Did he say oh, Trooper Cole, he's doing a
20  this or a that?
21  A. He asked me if I saw that vehicle, and I said no.
22  Q. Okay. Can I ask where your attention was focused at the
23  time the vehicle was spotted?
24  A. I believe I was on the radio talking to the supervisor, but
25  I could not be 100 percent sure.

### 44

1  Q. So you never actually saw the vehicle until -- well, let's
2  put it this way. Trooper Cole -- excuse me. Trooper Hamrick
3  saw the vehicle, initiated police action; that is, to follow it,
4  correct?
5  A. He saw a violation and pursued it -- pursued northbound; and
6  then about that time, I saw the vehicle commit a violation at
7  that point.
8  Q. Okay. You never saw it commit the first violation.
9  A. That's correct.
10  Q. Okay. You would agree that your vehicle was pointed towards
11  northbound traffic, in the median?
12  A. Correct.
13  Q. What violation did you observe?
14  A. After we pursued it northbound?
15  Q. Uh-huh.
16  A. I noticed the vehicle change lanes to the right and then
17  tailgate the vehicle in front of it.
18  Q. Do you recall how far it was?
19  A. How -- in --
20  Q. How far it was in front of the vehicle -- or how close it
21  was.
22  A. It was within 50 feet.
23  Q. Okay. Do you remember the vehicle that it was following?
24  A. It was a white car.
25  Q. Officer Cole --

### 45

1  MR. BUTLER: Just to move this forward, Your Honor, I'm
2  going to lead just a little bit.
3  Q. Officer Cole exited the vehicle and approached the
4  passenger?
5  A. No, sir.
6  Q. Excuse me. Officer Hamrick.
7  A. Correct.
8  Q. He exit -- once the vehicle was stopped, he approached.
9  What did you do when he --
10  A. I exited the vehicle and approached on the driver's side.
11  Q. Along with Officer Hamrick -- Trooper Hamrick.
12  A. Trooper Hamrick was on the passenger side.
13  Q. Okay. And you were on the --
14  A. Driver's side.
15  Q. -- driver's side. So when Trooper Hamrick was talking to
16  the driver, he was talking through the passenger side over to
17  him, correct?
18  A. Correct.
19  Q. And you were standing next to or close to that location when
20  he was speaking to the driver.
21  A. I was by the vehicle. Correct.
22  Q. By the driver's side.
23  A. Correct.
24  Q. Okay. Do you recall the driver getting out?
25  A. Yes.

### 46

1  Q. Was that at your -- whose direction was that?
2  A. Trooper Hamrick.
3  Q. What did you do when you heard that direction; that is,
4  Mr. Gonzales, please exit the vehicle. What did you do?
5  A. I stepped back toward our -- toward Trooper Hamrick's patrol
6  car.
7  Q. Did you communicate during this time period with anyone by
8  way of radio or telephone?
9  A. No.
10  Q. What did you consider your function in this stop to be?
11  A. I was just an overwatch for Trooper Hamrick.
12  Q. And when you say -- what's overwatch mean?
13  A. While Trooper Hamrick was conducting his duties, I was
14  ensuring the two occupants did not take any aggressive action
15  toward us.
16  Q. And they didn't during this.
17  A. Correct.
18  Q. Did you participate in any way in the writing of a citation
19  or any type of report related to this incident?
20  A. No.
21  Q. Had you ever ridden -- I know you said you didn't usually do
22  it, but had you ever ridden with Trooper Cole -- I mean Hamrick
23  before?
24  A. No, sir.
25  Q. Had you ever patrolled the area -- I'm just going to call it

47

1  the route 159 to -- mile marker 159 to approximately mile marker
2  165 area?
3  A. I have traveled that road. Yes.
4  Q. You have ticketed and cited people in that area before?
5  A. Correct.
6  Q. Have you ever worked in -- not in the same vehicle, but in
7  conjunction with any other officer during that -- in that --
8  my -- my point being, you're at 159 and another officer may be
9  at 164. You guys are working together for safety and other
10 purposes. Have you ever worked in conjunction with another
11 officer during that stretch -- in that stretch of road?
12      MR. BROWN: Objection to relevance of probable cause,
13 Your Honor.
14      THE COURT: How is this relevant?
15      MR. BUTLER: Your Honor, what we have here are two
16 officers, it's our position, working together. I'm just trying
17 to get a sense if this is normal routine practice in or about
18 that area.
19      THE COURT: Well, let's say it was. How does it matter
20 to this proceeding?
21      MR. BUTLER: Your Honor, again, it goes to the nature
22 and circumstances, facts and weight. What -- I'm just exploring
23 all --
24      THE COURT: Well, I usually allow some latitude on
25 this, as you know. But it's not clear to me how that's

48

1  relevant. I'm going to sustain the objection. Let's --
2       MR. BUTLER: Yes, Your Honor.
3       THE COURT: Let's just move on.
4       MR. BUTLER: Your Honor, I may be done. One moment.
5       THE COURT: Okay.
6  (Brief pause)
7  Q. Just a question from a layperson who hears it from officers
8  and on TV. How far is a car length? When you say that car is
9  traveling two car lengths too close or a car length behind, what
10 is a car length?
11 A. Depending on the size of the vehicle and the individual's
12 interpretation of the definition of a car length.
13 Q. Okay. So there is no set definition of car length. It's
14 just what one officer might -- your definition of a car length
15 might be different from Officer Cole or any other officer.
16 A. My definition depends on which vehicles I happen to observe
17 violating at that time, be it a passenger vehicle, a pickup
18 truck, or an 18-wheeler.
19 Q. Oh, okay. Well, maybe that makes it clear. If a car is
20 traveling, for instance, two car lengths behind another, you use
21 as the measuring vehicle what?
22 A. The size of that vehicle.
23 Q. The vehicle that is traveling too close --
24 A. Correct.
25 Q. -- not the vehicle in front.

49

1  A. Correct. That's how I interpret it.
2  Q. Okay. So a car length can vary -- a limo, the car length of
3  a limo, is different than a car length of a Volkswagen Beetle.
4  A. Correct.
5      MR. BUTLER: Okay. Thank you. Nothing further.
6      THE COURT: Anything else?
7      MR. BROWN: No questions, Your Honor.
8      THE COURT: All right. You may step down.
9  Any other witnesses for the defendant?
10     MR. BUTLER: No, Your Honor.
11     THE COURT: All right. Any rebuttal?
12     MR. BROWN: No, Your Honor.
13     MR. BUTLER: Your Honor, again, it's -- we'll leave it
14 to the Court's discretion to determine if there's probable
15 cause.
16     THE COURT: I understand. I do find probable cause to
17 believe that the three offenses noted in the criminal complaint
18 were committed and that the defendant committed those offenses,
19 and I will bind him over for further proceedings in the court.
20     Thank you. Everybody who's here for just that
21 proceeding is excused.
22     MR. BROWN: Thank you, Your Honor.
23     MR. BUTLER: Thank you, Your Honor.
24 (Proceedings concluded at 3:06 p.m.)
25     * * * * * * * * * * *

50

1        COURT REPORTER'S CERTIFICATE
2     I certify that the foregoing is a correct transcript
3  from the official sound recording of the proceedings in the
4  above-entitled matter.
5     This 26th day of May, 2006.



       RISA L. ENTREKIN, RDR, CRR
       Official Court Reporter



U.S. Immigration and Customs Enforcement

## DECLARACION DE DERECHOS

Antes nosotros le preguntamos cualquiera pregunta, es mi deber para aconsejarle de sus derechos.

Usted tiene el decho de guadar silencio.

Cualquier cosa que usted diga puede ser usada en contra de usted en la corte, o en otros procedimientos.

Usted tiene el derecho de consultar a un abogado antes hacer cualquier declaración o contestando que cualquiera pregunta.

Usted tiene el derecho de tener un presente de abogado con usted durante el interrogatorio.

Si usted no tiene el dinero para emplear a un abogado, se le puede proporcionar uno antes de que le hagamos alguna pregunta, si usted lo desea

Si usted decide contestar las preguntas ahora, usted tiene todavía el derecho de parar el interrogatorio en tiempo, o para parar el interrogatorio para el propósito de consultar a un abogado.

---

## RENUNCIA

He tenido el encima de la declaración de mis derechos leyó y explicado a mí y a entiendo completamente estos derechos. Yo los renuncio libremente y voluntariamente, sin la amenaza o la intimidación y sin cualquier promesa de la recompensa o la inmunidad. Fui tomado en la custodia en _____ (tiempo), en 4/10/06 (fecha), y ha firmado este documento en 4:30 pm (tiempo), en 4/10/06 (fecha).

Ricardo Gonzalez
Print Nombre                                    X _____
                                                Firma

TESTIGO: _____                      FECHA: 04/10/06

TESTIGO: _____                      FECHA: 04/10/06

GOVERNMENT'S EXHIBIT
B

3